IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

| | | |
|---|---|---|
| CHIKEITHA OWENS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 3:03-CV-1184-H |
| | * | |
| NATIONWIDE MUTUAL INSURANCE | * | |
| COMPANY | * | |
| | * | |
| Defendant. | * | |
| | * | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant's Renewed Motion for Summary Judgment, filed May 21, 2004; Plaintiff's Response, filed August 16, 2004; Defendant's Motion to Strike Plaintiff's Proffered Summary Judgment Evidence, filed September 3, 2004; and Plaintiff's Response, filed October 1, 2004. Also before the Court are Defendant's Supplemental Brief in Support of its Motion for Summary Judgment, filed Jun 1, 2005; Plaintiff's Supplemental Brief in Opposition, filed May 16, 2005; Plaintiff's Supplemental Expert Report, filed June 10, 2005; and Defendant's Supplemental Rebuttal Report, filed June 21, 2005. The Court will address the Motion to Strike as necessary to rule on Defendant's Motion for Summary Judgment. Upon review of the pleadings, briefs, and relevant authorities, the Court is of the opinion that Defendant's Renewed Motion for Summary Judgment should be **GRANTED**.

## I.    BACKGROUND

Plaintiff Chikeitha Owens, an African-American homeowner, applied for homeowners' insurance with Defendant Nationwide Mutual Insurance Company in August 2002. Defendant

denied Plaintiff's insurance application, citing Plaintiff's poor credit.  (Pl.'s Compl. at 10; Def.'s

App. at 1.)  Plaintiff brings this action alleging that Defendant racially discriminated against her

by using her credit history as a means to deny coverage for which she was otherwise qualified.

(Pl.'s Compl. at 1, 2, 10, 14, 15, 16.)  Plaintiff claims that the use of credit information in

determining eligibility for homeowner's insurance has a disparate impact upon minority

populations and that Defendant uses such credit information to intentionally discriminate against

minorities.  (*Id.* at 16.)  Plaintiff claims that Defendant's denial of her homeowner's insurance

application violates 42 U.S.C. §§ 1981, 1982, and 3604.  Jurisdiction for the case arises under 28

U.S.C. § 1331.

The Court converted Defendant's Motion to Dismiss Plaintiff's § 3604 claim into a

Motion for Summary Judgment and continued its consideration of the Motion while the parties

engaged in limited discovery on the issues of whether: (1) Plaintiff had sued the wrong

corporation;[1] (2) Defendant and its affiliate use credit scoring in determining eligibility for

homeowner's insurance; (3) the credit report of Plaintiff's husband also rendered Plaintiff

ineligible for homeowner's insurance;[2] and (4) race played a factor in evaluating Plaintiff

eligibility for homeowner's insurance.  (Mem. Op. & Order, entered Oct. 1, 2003, at 6.)

The parties then stipulated that Defendant had no knowledge of Plaintiff's race at the

time it made its decision to deny Plaintiff coverage. (Agreed Order for Discovery, entered Jan.

16, 2004, at 2.)  The parties asked the Court to resolve the issue of whether, as a matter of law,

---

[1] Defendant no longer asserts that Plaintiff has raised her claims against the wrong company in this Renewed Motion for Summary Judgment .  (Def.'s Br. at 1 n.2.)  Therefore, the Court does not consider that ground herein.

[2] Because Plaintiff argues that the use of credit generally is discriminatory, the Court does not analyze this argument separately.

knowledge of an applicant's race is required for a discrimination claim predicated upon racial animus to survive summary judgment. (*Id*.)  The Court allowed briefing and oral argument on the issue, ultimately declining to decide the issue as a matter of law, and directing the parties to conduct discovery to enable the Court to rule on Defendant's Motion.  (Order, entered Dec. 6, 2004; Order, entered Jan. 27, 2005; Order, entered Feb. 22, 2005; Order, entered Mar. 24, 2005.)

The parties, having conducted the requisite discovery, have submitted their supplemental documents pertaining to Defendant's Renewed Motion for Summary Judgment on which the Court will now rule.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the facts and law as represented in the pleadings, affidavits, and other summary judgment evidence illustrate that no reasonable trier of fact could find for the non-moving party as to any material fact.  FED. R. CIV. P. 56; *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Innovative Database Systs. v. Morales*, 990 F.2d 217 (5th Cir. 1993).  "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Properties, Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322-25).  If the movant fails to meet its initial burden, the motion must be denied, regardless of the nonmovant's response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant does meet its burden, the nonmovant must go beyond the pleadings and designate specific facts showing that a genuine issue of material fact exists for trial. *Matsushita*

3

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998). A party opposing summary judgment may not rest on mere conclusory allegations or denials in its pleadings unsupported by specific facts presented in affidavits opposing the motion for summary judgment. FED. R. CIV. P. 56(e); *Lujan*, 497 U.S. at 888; *Hightower v. Texas Hosp. Assn.*, 65 F.3d 443, 447 (5th Cir. 1995); *Moody v. Jefferson Parrish Sch. Bd.*, 803 F. Supp. 1158, 1163 (E.D. La. 1992).

In determining whether genuine issues of fact exist, "[f]actual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch*, 140 F.3d at 625; *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001); *see also Eastman Kodak v. Image Technical Services*, 504 U.S. 451 (1992). However, in the absence of any proof, the Court will not assume that the non-moving party could or would prove the necessary facts. *Lynch*, 140 F.3d at 625. A party must do more than simply show some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991).

## III.   ANALYSIS

Plaintiff sues for insurance discrimination under §§ 1981 and 1982 of Title II of the Civil Rights Act and § 3604 of the Fair Housing Act ("FHA"). 42 U.S.C. §§ 1981, 1982, 3604 (2003). Plaintiff alleges that Defendant's policy of using credit to evaluate the eligibility of homeowner's insurance applicants has a disparate discriminatory effect and is a form of intentional discrimination under the statutes. (Pl.'s Compl. at 10-11, 12.) The Court first analyzes whether homeowner's insurance discrimination is actionable under the various statutes.

4

**A.      *Applicability of §§ 1981, 1982, and 3604 to Insurance Discrimination***

In light of the statutory provisions which are silent with respect to their applicability to insurance, the first question that must be addressed is whether insurance discrimination creates a cognizable action under §§ 1981, 1982, and 3604.  As discussed more fully below, the consensus among the circuit courts is that discrimination in the provision or pricing of homeowner's insurance related to the purchase of a home is cognizable under §§ 1982 and 3604.

**1.      Section 1981**

Section 1981 states that

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Id*. § 1981.

Homeowner's insurance is a contract and is therefore subject to § 1981.  *See* 42 U.S.C. § 1981; *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003).  *See also Green v. State Bar of Texas*, 27 F.3d 1083 (5th Cir. 1994) (dismissing claim of racial discrimination in insurance because plaintiff failed to allege that insurer refused to contract with plaintiff or impeded plaintiff's right to enforce a contract).

**2.      Section 1982**

Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." *Id*. § 1982.

Defendant acknowledges that insurance discrimination is unlawful under certain circumstances (Def.'s Br. at 17), but claims that insurance discrimination is unlawful under § 1982 only to the extent it affects the ability of a minority to inherit, purchase, lease, sell, hold, or convey a home. *See, e.g., Dehoyos v. Allstate Corp.*, 345 F.3d 290, 295 (5th Cir. 2003); *Riley v. Transamerica Ins. Group Premier Ins. Co.*, 923 F. Supp. 882, 888 (E.D. La. 1996), *aff'd, Riley v. TIG Ins. Co.*, 117 F.3d 1416.[3]   Contrary to Defendant's assertions, the Court finds *Dehoyos* and *Riley* inapposite to Plaintiff's' § 1982 claims, since § 1982 also includes the right to "hold" and "sell" a home.   *See* 42 U.S.C. § 1982.   It has been recognized widely by courts that the availability of mortgage financing is often predicated upon the ability to purchase homeowner's or hazard insurance.   *See Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1354 (6th Cir. 1995), *cert. denied*, 516 U.S. 1140 (1996); *Nat'l Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 58 (D.D.C. 2002); *Lindsey v. Allstate Ins. Co.*, 34 F. Supp. 2d 636, 642 (W.D. Tenn. 1999).[4]   (*See* Pl.'s App. at 445.)   Since mortgage financing is necessary for the purchase of a home, discriminatory denials of insurance affect a prospective homeowner's ability to purchase a home.   *See Cisneros*, 52 F.3d at 1354.   Furthermore,

---

[3]   Although *Riley* was an FHA case rather than a § 1982 case, Defendant argues that its reasoning is equally applicable to § 1982.   Defendant's reliance on *Riley*, however, is misplaced as it does not relate to the denial of insurance to an owner or mortgagor of a property and therefore does not relate to claimant's right to make or enforce contracts, but only to the payment on a damages claim.   *See Riley*, 923 F. Supp. at 888; *Lindsey v. Allstate Ins. Co.*, 34 F. Supp. 2d 636, 642 n.1 (W.D. Tenn. 1999) (distinguishing *Riley*); *Burrell v. State Farm and Cas. Co.*, 226 F. Supp.2d 427, 442 n.1 (S.D.N.Y. 2002) (same).

[4]   The Court agrees with the Seventh Circuit that the distinction between hazard and homeowner's insurance is not meaningful for purposes of availability of housing.   *See United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations Comm'n*, 24 F.3d 1008, 1014 n.8 (7th Cir. 1994) (rejecting distinction between hazard insurance and homeowner's insurance noting that "[b]y refusing to issue a homeowner's insurance policy, the cost of owning a home or real property is increased, perhaps prohibitively.   The property owners would be required to carry the risks and bear the costs for all injury, loss, or damage other than for the limited situations covered by hazard insurance.   This undoubtedly could make owning and retaining real property unavailable . . . .").

mortgage financing is often necessary for the maintenance, or ability to "hold" a home as well, since homeowners may be required to take out a second mortgage to properly maintain their property. *See United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations Comm'n*, 24 F.3d 1008, 1014 n.8 (7th Cir. 1994). The Court therefore concludes that discriminatory denials to existing homeowners affect the rights enumerated in § 1982, creating a cause of action under the statute. *See Lindsey*, 34 F. Supp. 2d at 643-44.

The Court also considers an insurance policy to be personal property for purposes of § 1982. *See Harary v. Allstate Ins. Co.*, 983 F. Supp. 95, 99 (E.D.N.Y. 1997); *Sims v. Order of United Comm. Travelers of Am.*, 343 F. Supp. 112 (D.C. Mass. 1972). Discriminatory denial of homeowner's insurance therefore creates both an indirect and a direct cause of action under § 1982.

### 3.    Section 3604

Section 3604(b) of the FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." *Id*. § 3604(b).

Defendant claims that § 3604 does not apply to homeowner's insurance for reasons similar to those discussed above related to § 1982. (Def.'s Br. at 17-21.) Although § 3604 has a more narrow scope than does § 1982, *compare* 42 U.S.C. § 1982 *with* 42 U.S.C. § 3604, Defendant's position is as untenable in the FHA context as it is in the § 1982 context rejected above. *See generally Lindsey*, 34 F. Supp.2d 636.

Section 3604 is silent and ambiguous with respect to whether the ability to obtain homeowner's insurance is related to the ability to convey real and personal property. *See Cisneros*, 52 F.3d at 1356-57; *N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992), *cert. denied*, 508 U.S. 907 (1993). "[I]f the statute is silent or ambiguous with respect to

the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984).  Therefore, the Court's determination as to whether the discriminatory provision of homeowner's insurance is prohibited under the FHA turns on an analysis of the Department of Housing and Urban Development's (HUD) regulations related to discriminatory provision of insurance.  *See Prudential*, 208 F. Supp. 2d at 55.

Section 3614(a) of the FHA authorizes HUD to promulgate regulations implementing the FHA.  42 U.S.C. § 3614(a).  The HUD regulations make it unlawful to refuse to provide "property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin" where such services or insurance are in connection with the provision of housing.  24 C.F.R. § 100.70(d)(4).

Although the Fifth Circuit has not had an opportunity to address the reasonableness of the HUD regulations, the Sixth Circuit has determined the HUD regulations to be a reasonable interpretation of the statute and entitled to deference.  *Cisneros*, 52 F.3d at 1358, 1360.  The Sixth Circuit adopted HUD's interpretation of the statute, finding that "the availability of property insurance has a direct and immediate affect [*sic*] on a person's ability to obtain housing." *Id*.

The Court adopts the Sixth Circuit's conclusions in *Cisneros* that HUD's regulations implementing the FHA are reasonable.  *See Lopez v. City of Dallas, Texas*, No. 3:03-CV-2223-M, at *8-9 (N.D. Tex. Sep. 9, 2004) (slip copy); *Burrell v. State Farm and Cas. Co.*, 226 F. Supp. 2d 427, 442 (S.D.N.Y. 2002); *Prudential*, 208 F. Supp. 2d at 57; *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 6 (D.D.C. 1999).  This conclusion is consistent with the broad reading afforded § 3604 to promote "truly integrated and balanced living patterns" and give effect to the FHA's remedial purpose.  *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211-12 (1972);

8

*Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Evans v. Tubbe*, 657 F.2d 661, 662 n.2 (5th Cir. 1981).

Defendant claims that insurance discrimination is unlawful under § 3604 only to the extent it affects the ability to purchase a home.  This reading of the case law would require, for instance, the Court to limit the liability of insurance companies engaging in discriminatory redlining to only those individuals who were denied or otherwise received different insurance when applying to purchase a home.  *See N.A.A.C.P.*, 978 F.2d at 290.  It would not apply to individuals who seek insurance associated with the refinancing of a home or otherwise maintaining the property.  Such a limited reading of the case law is not supported by the redlining cases or by the purpose of the statute noted above.  *See United Farm Bureau*, 24 F.3d at 1014 n.8.

Furthermore, the reasoning in the cases finding insurance discrimination to be unlawful under § 3604 seems equally applicable in the context where a policy is sought to insure a home already purchased by the plaintiff.  *See, e.g., Lindsey,* 34 F. Supp. 2d at 642.  Due to the relationship between homeowner's insurance and mortgage financing, homeowner's insurance may be necessary to restore a property to its previous condition prior to a loss-inflicting event. Homeowner's insurance may therefore provide a homeowner the opportunity to rebuild and sell a home previously damaged.  Denial of homeowner's insurance would therefore restrict the "terms, conditions, or privileges of sale or rental of a dwelling," creating a cause of action under § 3604.  *See* 42 U.S.C. § 3604.

The Court therefore concludes that discrimination in the provision of homeowner's insurance restricts the ability of a homeowner or prospective homeowner to inherit, purchase, lease, sell, hold, and convey real and personal property for purposes of § 1982 and affects the

terms, conditions, and privileges of a sale or rental of a dwelling for purposes of § 3604.  *See Lindsey*, 34 F. Supp. 2d at 642; *Wai*, 75 F. Supp. 2d at 6 (citing cases).  The Court concludes this to be true whether the insurance is sought in connection with the maintenance of a previously purchased home or with an application to purchase a home.  Additionally, the Court concludes that homeowner's insurance is a contract for purposes of § 1981.

Having established that discrimination in the provision of homeowner's insurance is actionable under §§ 1981, 1982, and 3604, the Court now addresses the two means by which Plaintiff attempts to prove her individual and class discrimination claims.  Plaintiff claims that Defendant: (1) intentionally used a credit evaluation system in determining homeowner's insurance eligibility as a means to discriminate against minority applicants; and (2) created a facially neutral policy of using credit to determine eligibility for homeowner's insurance which was not justified by any legitimate business purpose.  (Pl.'s Compl. at 10-11, 12.)  The first claim is characterized under law as an intentional discrimination or disparate treatment claim, while the latter is a disparate impact or disparate effect claim.

### B.    *Intentional Discrimination Claims*

### 1.    *McDonnell Douglas* **Framework**

The Court evaluates individual discrimination claims that rely on circumstantial evidence, including insurance discrimination claims arising under §§ 1981, 1982, and § 3604, using the burden-shifting approach from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5]  *See Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1556 (5th Cir. 1996);[6] *Moore v.*

---

[5] The *McDonnell Douglas* framework is not the exclusive framework for establishing a *prima facie* case of intentional discrimination and its requirements are not fixed.  *Teamsters v. United States*, 431 U.S. 324, 358 & n.44 (1977).  However, its burden-shifting framework is utilized where a plaintiff does not have direct evidence of intentional discrimination and a defendant is the most likely source of information pertaining to the effect of its decisions and the reasons behind such decisions.  *Id.*  The Fifth Circuit has applied the *McDonnell Douglas*

*Dep't of Agric.*, 55 F.3d 991, 995 (5th Cir. 1995).  *See also Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir. 1989); *Reynolds v. Quarter Circle Ranch, Inc.*, 280 F. Supp. 2d 1235 (D. Colo. 2003).  The Supreme Court developed this approach "to deal with cases in which discrimination can be proved only by circumstantial evidence." *Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000)).

The *McDonnell Douglas* framework is used to analyze Plaintiff's individual and class intentional discrimination claims arising under §§ 1981 and 1982 as well as Plaintiff's individual intentional discrimination claim under § 3604.  Because intentional discrimination claims arising under the different statutes are analyzed under the same standards, *see Asbury*, 866 F.2d at 1279; *Patterson v. Guttman*, 225 F.3d 659 (6th Cir. 2000) (Table), the Court, for purposes of economy, engages in an analysis of the evidence only once.

---

framework to insurance discrimination claims, finding such a burden-shifting approach justified. *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1556 (5th Cir. 1996) (applying *McDonnell Douglas* in discriminatory effects case).

In a class action context, plaintiffs claiming intentional discrimination "*must* show a 'pattern or practice' of discrimination by the [defendant], *i.e.* that 'racial discrimination was the company's standard operating procedure--the regular rather than the unusual practice.'" *Munoz*, 200 F.3d at 299 (emphasis added) (quoting *Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

[6] *Simms* was predicated upon age discrimination law, which is analyzed under the *McDonnell Douglas* framework.  The holding in *Simms* has since been modified by the Supreme Court's recent approach to circumstantial intentional discrimination cases.  In *Reeves*, the Supreme Court decided that to overcome summary judgment, a plaintiff need not prove an age animus where a *prima facie* case is made and plaintiff sufficiently rejects the defendant's reasons.  *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 147 (2000).  The *McDonnell Douglas* framework and its progeny therefore modifies the holding in *Simms* such that intentional insurance discrimination cases resting upon the *McDonnell Douglas* framework need not prove racial animus where a *prima facie* case is made and a genuine issue of material fact exists as to whether a defendant's reasons are false, thereby inferring pretext.  Throughout this discussion, for the purposes of establishing the contours of the *McDonnell Douglas* framework, the Court relies upon Title VII and other discrimination cases which utilize the *McDonnell Douglas* framework as needed.

Under the *McDonnell Douglas* framework, to overcome summary judgment, the plaintiff is first required to establish a *prima facie* case of discrimination. Under the statutes, a "*prima facie* case is fairly easily made out." *Amburgey*, 936 F.2d 805, 812 (5th Cir. 1991); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (citing *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)).

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for its decision. *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 395 (5th Cir. 2002); *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 680 (5th Cir. 2001); *Evans*, 246 F.3d at 350. Once the defendant provides a legitimate, non-discriminatory reason for the discharge, the presumption created by the *prima facie* case drops out; the plaintiff must then prove that the reason proferred by defendant is a pretext for discrimination.[7] *See Evans*, 246 F.3d at 350 ("If the defendant can articulate a reason that, if believed, would support a finding that the action was nondiscriminatory, the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out of the picture and the factfinder must decide the ultimate question: whether the plaintiff has proved intentional discrimination.") (internal quotations omitted) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511-12 (1993)); *Pribila v. Emerson Elec. Co.*, No. CIV.A.3-00-2742BE, 2002 WL 629528,

---

[7] Plaintiff seeks to apply a "pattern or practice" analysis to Plaintiff's class claims of intentional discrimination. Such an analysis requires a different showing for a plaintiff to make a *prima facie* case of discrimination. *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875-76 (1984). *See Teamsters*, 431 U.S. at 358-59; *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 158-60 (2d Cir. 2001). Under either the *McDonnell Douglas* or "pattern or practice" framework, once a defendant provides a legitimate, nondiscriminatory reason for the policy, the plaintiff must provide evidence refuting the reasons put forth by the defendant. *Bauer v. Albemarle Corp.*, 169 F.3d 962, 968 (5th Cir. 1999); *Siler-Khodr v. Univ. of Texas Health Science Center San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001). Accordingly, because the Court assumes *arguendo* that Plaintiff has presented a *prima facie* case, the Court need not elaborate upon the differences between the *prima facie* cases under the *McDonnell Douglas* and "pattern or practice" frameworks.

at *11 (N.D. Tex. Apr. 16, 2002) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 992 (5th Cir. 1996)).

To rebut defendant's legitimate non-discriminatory reason, the plaintiff must create a genuine issue of material fact as to the veracity of the defendant's reason, thereby inferring that the reason was a pretext for discrimination. *See Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001). This may include evidence presented as part of plaintiff's *prima facie* case. *Id.* A showing of pretext, however, requires a more substantial showing than the presumptive *prima facie* case. *See Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004).

"A plaintiff's *prima facie* case, combined with sufficient evidence to find that the [defendant's] asserted justification is false, may permit the trier of fact to conclude that the [defendant] unlawfully discriminated." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350-51 (5th Cir. 2005) (internal quotation omitted). Evidence of both pretext and actual discriminatory intent is not required. *Id.* at 350. Indeed, "[e]vidence demonstrating the falsity of the defendant's explanation, taken together with the *prima facie* case, is likely to support an inference of discrimination even without further evidence of [the] defendant's true motive." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002); *but see Reeves*, 530 U.S. at 148 (noting that a showing of pretext may not be sufficient to infer discrimination where plaintiff creates a weak issue of fact as to the issue of pretext and evidence exists); *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (same). "[A] plaintiff relying upon evidence of pretext to create a fact issue on discriminatory intent falters if he fails to produce evidence rebutting all of a defendant's proffered nondiscriminatory reasons." *Machinchick*, 398 F.3d at 351 & n.16.[8]

---

[8] Plaintiff fails to meet the "high evidentiary burden" to establish that Defendant had both legitimate and illegitimate reasons for the policy under a mixed-motives alternative. *See Lepore v. Lanvision Sys., Inc.*, 113 Fed. Appx. 449, 453 (3d Cir. 2004); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (evidence must demonstrate that the "decision makers placed

The Court considers "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the [defendant's] explanation is false, and any other evidence that supports the [defendant's] case and that properly may be considered on a motion for judgment as a matter of law." *Laxton*, 333 F.3d at 579; *Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001).

In the instant case, to demonstrate pretext in Plaintiff's intentional discrimination claim, Plaintiff must present sufficient evidence to allow a factfinder to determine that Defendant's reason for utilizing the credit standard was to identify and discriminate against members of a protected class. *See Laxton*, 333 F.3d at 579. It is not whether the use of credit is in fact discriminatory. *Id.*

### 2.     Analysis

Assuming *arguendo* that Plaintiff has made a *prima facie* case under both the *McDonnell Douglas* and the "pattern or practice" frameworks – a matter of significant dispute in the case[9] –

---

substantial negative reliance on an illegitimate criterion in reaching their decision). *See also Machinchick*, 398 F.3d at 341. Accordingly, since the parties do not argue the issue, the Court does not further address a mixed-motives approach to proving discriminatory intent. *See id.* at 340; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (adopting the modified *McDonnell Douglas* approach where the mixed-motives analysis might apply).

[9]  Indeed, Plaintiff's position on the matter of what constitutes a *prima facie* case has changed considerably throughout the course of this litigation. Plaintiff's Response to Defendant's Motion to Dismiss/Motion for Summary Judgment, filed September 3, 2003, indicated, "[t]hat [Defendant] may not have known Plaintiff's race is irrelevant. Plaintiff alleges that [Defendant] discriminates through its use of credit information, which enables it to identify minorities." (Pl.'s Resp. at 2.) "[Defendant] uses credit information it obtains to identify non-Caucasians in order to charge them higher premiums or deny them coverage altogether." (*Id.* at 3.) "Plaintiff outlines [Defendant's] use of credit information as a tool to identify and to place minorities into higher priced policies or deny them coverage altogether." (*Id.* at 7.) "[Defendant] uses credit information to identify minority insurance applicants." (*Id.* at 18.) Similarly, in Plaintiff's Response to Defendant's Renewed Motion for Summary Judgment, filed August 16, 2004, Plaintiff states, "[Defendant] well knows that Plaintiff's claim focuses on its adoption and use of a credit evaluation system that uses credit as a proxy for race." (Pl.'s 2d Resp. at 1, 10-11.) Even in oral argument, Plaintiff relied upon a theory that credit is a proxy for race. (*See* Transcript, Hearing on Mot. for Summ. Judgment, Dec. 3, 2004, at 17.)

Now, however, Plaintiff sings a different tune. Plaintiff now argues that "the question

14

Defendant must present a legitimate business reason for the practice.  Defendant asserts that credit is a predictor of expected loss in homeowner's insurance.[10]  Plaintiff must therefore rebut Defendant's proffered reason to overcome summary judgment under both the *McDonnell Douglas* and "pattern or practice" frameworks.[11]  Plaintiff attempts to rebut Defendant's reason in a number of ways.  For the following reasons, the Court concludes that Plaintiff has failed to do so.[12]

### a.    Shifting and Unclear Explanations

Plaintiff argues that Defendant's explanation(s) have shifted, thereby creating an inference of discriminatory purpose.  (Pl.'s Supp. Br. at 35.)  However, unlike Plaintiff's cited cases, Defendant here has not shifted its explanations, but consistently claimed that credit is a

---

also is not whether [Defendant] knew [Plaintiff's] race or could decipher her race from her credit information (acting as a proxy)."  (Pl.'s Supp. Br. at 27.)

[10] Defendant also asserts that without the use of credit, its business would suffer from adverse competitive selection, as other companies are using credit.  (Pl.'s App. at 254, 268 (Mallassee Depo.); Pl.'s Supp. App. at 131-32 (Cummins Depo.), 389, 439 (Dusenbury Depo.), 821 (Mabe Depo.).)  The effect that the use of credit might have on Defendant's market position, however, is dependent upon the predictive value of the nature of credit, and therefore need not be independently reviewed.  (*See* Pl.'s Supp. App. at 439 (Dusenbury Depo.).)

[11] Although Plaintiff has no direct evidence of discrimination, the Court notes that "'it is not particularly significant whether [the plaintiff] relies on the *McDonnell Douglas* presumption or . . . on direct or circumstantial evidence of discriminatory intent' because '[u]nder either approach, [the plaintiff] must produce some evidence suggesting that [the defendant's decision] was due in part or whole to discriminatory intent, and so must counter the [defendant's legitimate, nondiscriminatory reason].'"  *Roberson v. Alltel Info. Sys.*, 373 F.3d 647, 652 (5th Cir. 2004) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004)).

[12] While many of Plaintiff's arguments relate more clearly to establishing an inference of discrimination necessary for a *prima facie* case in the traditional discrimination framework (not *McDonnell Douglas*), *see Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir. 1992) (discussing the use of statistical evidence and other circumstantial evidence of discrimination as a means to establish a *prima facie* case of intentional discrimination); *Siler-Khodr v. Univ. of Texas Health Science Center San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001) (concluding that statistical evidence does not create an inference of pretext), in an abundance of caution, the Court considers these arguments as they relate to Defendant's legitimate business reason.

known predictor of loss. (Pl.'s Supp. App. at 100, 126, 128, 151 (Cummins Depo.), 254, 263 (Mallassee Depo.), 440 (Dusenbury Depo.), 847, 854-56, 868, 869-70, 895 (Mabe Depo.), 1033, 1081-82 (Baum Depo.).) Whether this predictive ability is predicated upon moral hazard (the willingness of an insured to commit insurance fraud) (*Id.* at 56, 58, 60-63 (Cummins Depo.), 870 (Mabe Depo.)), morale hazard (the possibility that an insured will not properly maintain or protect a home against avoidable loss) (*id.* at 61-62 (Cummins Depo.), 1121 (Baum Depo.)), or an individual insured's likelihood of filing a claim (*id.* at 1115-16 (Baum Depo.)), these differing explanations do not dispute the underlying proffered reason that credit is predictive of loss. Further, unlike Plaintiff's cited cases, Defendant's proffered reason and explanations for that reason are not arguably inconsistent. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001). Accordingly, Plaintiff's argument regarding the inconsistency of Defendant's proffered reason is wholly without merit.

Plaintiff further claims that Defendant's reason lacks sufficient clarity to allow an adequate rebuttal. (Pl.'s Supp. Br. at 35.) The Court's review of the record reveals this to be patently not the case. Plaintiff certainly was aware of the proffered reason and explanations and could prepare accordingly. That Plaintiff failed to do so does not make Defendant's reasons any less clear. Accordingly, Plaintiff's argument that Defendant's reason shifted and is unclear is without support and fails to raise an inference of pretext.

### b. Credit Committee

Plaintiff attempts to raise an inference of discrimination because the Credit Advisory Committee never conducted an evaluation of the use of credit in underwriting homeowner's insurance. (*E.g.*, Pl.'s Supp. Br. at 20-21, 39.) This argument lacks any merit whatsoever. There is no evidence that the Credit Advisory Committee had the responsibility for reviewing

the substantive use of credit in the differing lines of insurance;[13] rather, the evidence establishes that the Committee was established to ensure that privacy and reporting concerns were met, including that credit information was used consistently and fairly in accordance with state laws and the Fair Credit Reporting Act.[14]  (Pl.'s Supp. App. at 820, 822, 823, 826-27, 852, 897, 903 (Mabe Depo.), 76-77, 94, 97, 113-14, 118 (Cummins Depo.), 1156 (Baum Depo.).) Accordingly, that the Committee did not conduct a study out of its area of responsibility cannot serve as evidence of pretext.

### c.     Credit Evaluation System is Arbitrary

Plaintiff next argues that Defendant's credit evaluation system is arbitrary because no one could identify why the particular credit factors were selected or how the cut-off levels for each credit factor were established.  (Pl.'s Supp. Br. at 36.)  Plaintiff argues that Defendant has not "done any studies or analyses to determine whether or not there is a correlation between credit information and loss ratios in homeowners insurance in Texas."  (Pl.'s App. at 463.)

The Court, in its review of the documents, concludes that ample evidence exists in the record to support Defendant's use of the factors and the general cut-off levels used.  The Court is not willing to second-guess Defendant's use of a particular factor in that it may be too restrictive

---

[13] Plaintiff's citations on this point do not support Plaintiff's proposition that the Committee had any responsibility for the use of credit in determining eligibility for homeowner's insurance.  (*See* Pl.'s Supp. Br. at 20.)

[14] Further, Plaintiff attempts to infer discrimination because Katherine Mabe, chair and founder of the Committee (Pl.'s Supp. App. at 820, 831), could not identify any support for the proposition that credit is predictive of loss in homeowner's insurance.  (Pl.'s Supp. Br. at 37 n.23.)  Plaintiff misstates the evidence.  Ms. Mabe was not responsible for homeowner's insurance.  (*Id.* at 811, 813, 820, 833, 880, 904-05) (indicating that in her role as Vice President of Auto Product, she created a Credit Advisory Committee in 2001 to deal with issues related to credit in auto insurance pricing.)  Further, upon questioning, Ms. Mabe indicated that she believed major financial events, such as bankruptcies and things on a credit report, would be predictive of loss in homeowner's insurance.  (Pl.'s Supp. App. at 847, 868, 869, 870.)

or too lenient. The Court recognizes that Defendant has modified the cut-off values for its factors over time to maintain competitiveness and adjust to new data from the fields. (See Pl.'s Supp. App. at 255, 260, 277, 278 (Mallassee Depo.); 379, 380, 381, 387, 407, 434-35 (Dunesbury Depo.), 1074-77, 1116, 1154, 1190-97 (Baum Depo.).)

Further, Plaintiff argues that the reports relied upon by Defendant relate to auto insurance and credit scores, which are not applicable to a credit evaluation system based upon credit events in a homeowner's insurance context. (*Id*. at 38.) Plaintiff seeks to support this assertion by citing to the deposition testimony of Phil Baum, Defendant's designated actuary. (*See* Pl.'s Supp. App. at 1083-84.) However, Mr. Baum's testimony reveals that auto insurance studies may relate to the homeowner's insurance context. (*Id*. at 1081-82.) Further, Mr. Baum testified that a variety of studies exist, both internally conducted by Defendant and externally conducted,[15] validating the relationship between credit and risk of loss in homeowner's insurance, including the credit factors used by Defendant in its credit evaluation system. (*Id*. at 1033, 1066, 1068-69, 1079, 1082-83, 1095, 1100-01, 1102-04, 1106, 1115, 1116, 1118, 1120-21, 1167, 1190-97. *See also id*. at 123-24, 191-92 (Cummins Depo.)) Further, Defendant has conducted a study comparing its loss experience between customers who failed to meet its credit requirements but received waivers of the credit requirements (for having completed a credit counseling program) and customers who passed its credit requirements, the results of which indicate that customers receiving waivers are a significantly greater risk pool than are customers without credit issues. (*Id*. at 276-77 (Mallassee Depo.).)

---

[15] Plaintiff contends that Defendant did not conduct its own studies regarding the correlation between credit and loss expectancy in homeowner's insurance in Texas. (Pl.'s Supp. Br. at 16.) While this may be accurate, Plaintiff has failed to produce any evidence to rebut Defendant's claim that its multistate retroactive analysis conducted prior to Plaintiff's application for insurance may be applied, at least "directionally," to Texas data. (*See* Pl.'s App. at 1102-04, 1190-97 (Baum Depo.).)

The Court concludes that Plaintiff has failed to present sufficient summary judgment evidence to rebut Defendant's evidence that its credit evaluation system is not arbitrary. Accordingly, Plaintiff has failed to establish any inference of pretext based upon its argument that Defendant's system is arbitrary.

>       **d.       *Ex Post* Justification**

Plaintiff argues that Defendant could not produce evidence that the proffered reason was relied upon by the decisionmakers.  (Pl.'s Supp. Br. at 36.)  Plaintiff claims that any *ex post* justification for the reason should not be sufficient to overcome Defendant's burden of presenting a legitimate business reason for the policy.  *See Halfond v. Legal Aid Soc'y*, 70 F. Supp. 2d 155, 163 (E.D.N.Y.  1998).  Plaintiff further argues that the reports existing prior to the time when Plaintiff's claim accrued may not have been reviewed by Defendant until after Plaintiff's claim.  (Pl.'s Supp. Br. at 38-39.)

Upon the Court's review of the evidence, the Court concludes that Defendant has met its burden.  Although Plaintiff is correct that Defendant did not produce documentation concerning the reasons behind the initial decision to implement the credit evaluation system, Defendant has produced evidence, relating to times prior to when Plaintiff's cause of action accrued, justifying the continued existence of the credit evaluation system.  (*E.g.*, Pl.'s Supp. App. at 1560-67.) Accordingly, in relation to Plaintiff's claim, Defendant has met its burden to put forth a legitimate business reason.

Plaintiff further argues that the absence of documentary evidence pertaining to the decisionmaking process infers that Defendant's reason is false (*i.e.*, a discriminatory purpose, in the words of the Plaintiff).  (Pl.'s Supp. Br. at 36.)  Plaintiff cites *Wilson v. AM General Corp.*, 167 F.3d 1114, 1121-22 (7th Cir. 1999), for the proposition.  However, *Wilson* related to a

19

number of factors which when combined created such an inference.  While the Court agrees that in some situations the absence of documentary evidence can infer that Defendant's proffered reason is false, the Court concludes that the evidence provided by the Defendant is sufficient to meet its burden to present a legitimate nondiscriminatory reason.  Plaintiff's arguments are insufficient to overcome Defendant's stated reason and explanations, made prior to 2002, justifying Defendant's continued use of the credit evaluation system's use.

Plaintiff further argues that the studies referred to by Defendant do not support the initial decision to use the credit evaluation system by Defendant.  (Pl.'s Supp. Br. at 37.)  Plaintiff is mistaken; the studies show that credit is correlated to loss in homeowner's insurance.  (*See* Pl.'s Supp.  App. at 1033, 1066, 1068-69, 1079, 1082-83, 1095, 1100-01, 1102-04, 1106, 1115, 1116, 1118, 1120-21, 1167, 1190-97 (Baum Depo.).)  Accordingly, Plaintiff's claim lacks merit and no inference of pretext may be inferred.

### e.      Failure to Study Disparate Impact or Implement Safeguards

Plaintiff argues that Defendant was aware of possible disparate impact prior to Plaintiff's claim but did not study the possible effects.  (Pl.'s Supp. Br. at 16.)  Plaintiff suggests that this infers discrimination.  (Pl.'s Supp. Br. at .)

First, the evidence Plaintiff points to does not suggest knowledge of an actual disparate impact prior to Plaintiff's claim.  (*See* Pl.'s Supp. App. at 1430 (1996 report inconclusive); Pl.'s Supp. App. at 347-48 (vague reference).)  Indeed, Plaintiff relies upon Defendant's knowledge of consumer and regulatory noise and concern about credit for the proposition that Defendant was aware of the disparate impact of the use of credit.  However, the consumer and regulatory noise identified by Defendant was that related to privacy (*id*. at 76, 97, 127 (Cummins Depo.).), which Defendant addressed through the creation of the Credit Advisory Committee, discussed

*supra*.  To the extent that Defendant may have been aware of the possible disparate impact of the use of credit prior to Plaintiff's application, Plaintiff's evidence establishes that studies were done on the impact to "Consent Decree" markets.[16]  (*Id*. at 274 (Mallassee Depo.).)

Plaintiff nevertheless argues that Defendant's failure to implement any safeguards to ensure that its use of credit did not adversely impact minorities, as required by the Consent Decree, infers a discriminatory purpose.  (Pl.'s App. at 88.)  However, the only evidence on this issue indicates that Defendant did implement some safeguards as required by the Consent Decree.  (*See* Pl.'s Supp. App. at 273-74.)  These safeguards included a study of the impact of Defendant's credit evaluation system upon various markets, including urban markets and "Consent Decree" markets.  (*Id*. at 274.)  The Court will not inquire whether the safeguards undertaken by Defendant were sufficient under the terms of the Consent Decree.  That Defendant did engage in some safeguards in response to the Consent Decree negates any inference of a discriminatory purpose as proposed by Plaintiff.

Finally, the Court is unwilling to place Defendant into a Catch-22 dilemma whereby in order to avoid one inference of discrimination, Defendant must gather information about an applicant's race and analyze its policies impact upon racial minorities, when such data gathering and study itself may yield an inference of discrimination.  Indeed, Plaintiff's evidence indicates that the industry considers credit to be a valuable underwriting tool precisely because it is blind to race and other factors which, if known, might encourage discrimination.  (*See* Pl.'s Supp. App. at 269.)

---

[16] Although not a direct study on the impact Defendant's credit evaluation system has upon minority populations, it is designed to study similar redlining effects and is accomplished without compiling racial information.  The Court cannot infer pretext or discriminatory purpose from Defendant's study.

####     f.      Genesis in Discrimination

Plaintiff argues that the credit evaluation system employed by Defendant has its genesis in discrimination, which infers a discriminatory purpose.  *See James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 351-52 (5th Cir. 1977) (internal citation omitted).  To this end, Plaintiff claims that Defendant engaged in redlining activities prior to the creation of the credit evaluation system.  (Pl.'s Br. at 2-4.)  As evidence of this, Plaintiff relies on various published articles and a Consent Decree between Defendant and the United States Department of Justice which refer to redlining.[17]  The Consent Decree, however, does not assert that Defendant actually engaged in redlining.  (Pl.'s Supp. App. at 345.)  Accordingly, Plaintiff has no summary judgment evidence that Defendant engaged in discrimination at or about the time the credit evaluation system was initially implemented.[18]

Plaintiff claims that Defendant's credit evaluation system was established on April 15, 1997, the date the Consent Decree prohibited the use of redlining.  (Pl.'s Supp. App. at 346.)  The only basis Plaintiff has in asserting the inception date of the allegedly offending credit evaluation system is the deposition testimony of Phil Baum and a letter from Defendant to the Texas Department of Insurance. (Pl.'s Supp. App. at 1078-79, 1205-09.)

---

[17] Defendant moves to strike Plaintiff's proferred published, summary judgment evidence related to geographic redlining and credit scoring.  The Court **GRANTS** the Motion, finding such documents hearsay.  FED. R. EVID. 802; 29A AM. JUR.2D EVID. § 1412 ("[P]rivately printed books or other publications, when offered for the purpose of proving the truth of the matters stated therein, are excludable from evidence on hearsay grounds.").

[18] Plaintiff cites a number of cases which support the proposition that "suspicious timing" may infer pretext or discriminatory intent.  (*See* Pl.'s Supp. Br. at 34 (citing cases).)  The Court finds these employment-related cases inapposite to the instant case where, according to Plaintiff's version of the facts, Defendant was required to implement a new policy for determining eligibility for homeowner's insurance.  Indeed, under Plaintiff's theory, any system Defendant implemented as a result of the deadline imposed by the Consent Decree would infer discriminatory purpose.  The Court finds this proposition untenable.

Mr. Baum, an actuary and corporate designee on the issue of studies (as opposed to development of credit) stated directly that he did not know when credit was first used in underwriting homeowner's insurance policies, but could not disagree with an inception date of April 15, 1997, when confronted with the letter to the Texas Department of Insurance. (*Id*. at 1025, 1072-73, 1078-79.) This, however, only establishes that Mr. Baum could not disprove the 1997 date, not that he had affirmative knowledge of when the credit system was first implemented.

In reviewing the letter, the Court notes that Defendant "has been using the above credit factors as an eligibility factor since April 15, 1997." (*Id*. at 1208.) This does not establish that the credit system itself was established on that date, only that the specific credit factors listed by Defendant on the letter were in use that date. Indeed, in Plaintiff's Brief in Opposition to Defendant's Renewed Motion, Plaintiff claimed that Defendant "began ordering consumer credit information on applicants in the early 1990s." (Pl.'s Br. at 7 n.9.)

All other evidence presented by Plaintiff indicates that the credit evaluation system did not have its genesis at 1997. (*See, e.g.*, Pl.'s Supp. App. at 55-56 (Cummins Depo.) (early 1980s); *id*. at 376 (Dusenbury Depo.) (mid-1980s); *id*. at 828, 846, 920 (Mabe Depo.) (for a long time, at least as early as the mid-1990s); *id*. at 245, 246, 252, 262 (Mallassee Depo.) (credit used in auto insurance as least as early as 1984, used in homeowner's insurance at least as early as 1997); *id*. at 1287, 1301 (Baggaley Depo.) (based on review of documents believed credit was used by the industry in homeowners' insurance beginning in 2000 or 2001).) Without assessing the credibility of each piece of evidence, Plaintiff does not provide any summary judgment evidence that during these different time periods the policy had its genesis in discrimination.

Furthermore, even if Plaintiff did prove that Defendant had discriminated in 1997 or some other time period and that at the end of that era of discrimination the credit evaluation system was borne, Plaintiff has failed to provide any summary judgment evidence that the credit evaluation system was established because of racial animus. The Court refuses to infer any discriminatory purpose as to the credit evaluation system merely because it may or may not have been initially implemented (without regard to later justifications and support) upon the conclusion of a discriminatory practice. Accordingly, Plaintiff's evidence is insufficient to raise a valid inference of pretext.

Because Plaintiff's summary judgment evidence fails to sufficiently rebut Defendant's proffered legitimate business reason, Defendant's Motion for Summary Judgment as to Plaintiff's individual intentional discrimination claims arising under §§ 1981, 1982, and 3604 is **GRANTED**.

## B.    *Disparate Impact Claim*

A claim of disparate discriminatory effect is actionable under § 3604 of the FHA.[19] *Hanson*, 800 F.2d at 1386 ("A finding of intentional racial discrimination is necessary for recovery against a defendant under the Civil Rights Act. . . . However, a violation of section 804 of the Fair Housing Act [§ 3604] may be established not only by proof of discriminatory intent, but also by a showing of a significant discriminatory effect."); *Dews*, 109 F. Supp. 2d at 530 & n.3, 563-64 & n.91 (citing cases); s*ee Langlois v. Abington Housing Auth.*, 207 F.3d 43, 49 (1st Cir. 2000) (noting consensus among the circuit courts that the FHA provides a cause of action for disparate impacts); *Prudential*, 208 F. Supp. 2d at 58 & n.6 (citing cases); *Arlington Heights*,

---

[19] The Court already granted Defendant's Motion for Summary Judgment as to Plaintiff's disparate impact claims arising under §§ 1981 and 1982. (Order, entered Dec. 6, 2004, at 2.)

558 F.2d at 1290 (same).   Plaintiff's "[d]isparate impact claims may be brought by either individual plaintiffs or a class."   *See Munoz*, 200 F.3d at 300.

### 1.      Standard

To establish a *prima facie* case supporting a disparate impact or effect claim related to the discriminatory provision of insurance under § 3604, a plaintiff must prove that a specific facially neutral policy or practice created statistical disparities so great as to be "functionally equivalent to intentional discrimination," thereby disadvantaging members of a protected group. *Frank v. Xerox Corp.*, 347 F.3d 130, 135 (5th Cir. 2003); *Dews*, 109 F. Supp. 2d at 530-32; *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 1999) (Title VII); *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (Disparate impact claims involve practices "that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."); *see Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1367 (5th Cir. 1992) (Title VII).   *See also See Gonzales v. City of New Braunfels, Tx.*, 176 F.3d 834, 839 n.26 (5th Cir. 1999) (To make out a *prima facie* claim of disparate impact discrimination, "a plaintiff must (1) *identify* the challenged . . . practice or policy, and pinpoint the defendant's use of it; (2) demonstrate a disparate *impact* on a group that falls within the protective ambit of [the applicable statute]; and (3) demonstrate a *causal relationship* between the identified practice and the disparate impact.") (internal citations omitted).

> The relevant question in a discriminatory effects claim against a private defendant . . . is not whether a single act or decision by that defendant has a significantly greater impact on members of a protected class, but instead the question is whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class.

*Simms*, 83 F.3d at 1555.

Evidence must be provided indicating that the specifically identified policy is responsible for the disparate impact, controlling for other factors and policies. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989). To prove a disparate impact, the plaintiffs must undertake a "systematic analysis" of the policy or practice. *See Munoz*, 200 F.3d at 299. This analysis will, "of necessity, rely heavily on statistical proof." *Id.* at 300. Plaintiffs need not provide proof of discriminatory intent, motive, or animus. *See id.*, *citing Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). Therefore, "the evidence will focus on the degree of statistical disparity between protected and non-protected." *Id.* "Ordinarily, a *prima facie* disparate impact case requires a showing of a substantial statistical disparity between protected and non-protected [individuals]." *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (internal quotation omitted).

Determining whether a *prima facie* case has been made depends upon the entirety of the factual support available. *See Teamsters*, 431 U.S. at 339. Some factors have been identified: (1) the extent of the racially disparate impacts or the extent to which the decision will perpetuate segregation; (2) whether some discriminatory intent is shown, but not in an amount sufficient to support an intentional discrimination claim under *Washington v. Davis*, 426 U.S. 229 (1976); and (3) the nature of the relief sought. *See Arlington Heights,* 558 F.2d at 1290 (noting also that the importance of the interest of the defendant in taking the allegedly discriminatory action must be considered in determining ultimate liability).

"Discriminatory effect under the Fair Housing Act may be proven by showing either (1) 'adverse impact on a particular minority group' or (2) 'harm to the community generally by the perpetuation of segregation.'" *Dews*, 109 F. Supp. 2d at 564 (quoting *Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir. 1988), *aff'd*, 488 U.S. 15).

A defendant may rebut the presumption of discrimination which is established by the plaintiff's *prima facie* case by presenting evidence that the challenged practice is related to legitimate business goals (*i.e.*, the underwriting process) and is consistent with business necessity. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 424 (5th Cir. 1998); *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1525 (5th Cir. 1993); *see also* 42 U.S.C. § 2000e-2(k)(1)(A)(I). To this end, the Court "would have to consider, first, the [defendant's] justification for the use of the[ allegedly offending practices], and, second, the availability of alternative practices to achieve the same business ends, with less racial impact. *Frazier*, 980 F.2d at 1525-26 (internal citations omitted).

This yields a three-part burden-shifting test whereby (1) the plaintiff must prove up a prima facie case; (2) if the plaintiff does so, the burden shifts to the defendant to prove that the discriminatory effect is justified by business necessity; (3) if the defendant does so, the plaintiff must "show that other tests or selection protocols would serve the [defendant's] interest without creating the undesirable discriminatory effect" and that defendant refused to adopt them. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005); *Banos v. City of Chicago*, 398 F.3d 889, 892 (7th Cir. 2005); *Lanning v. Southeastern Penn. Transp. Auth. (SEPTA)*, 181 F.3d 478, 485 (3d Cir. 1999); *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1312 (10th Cir. 1999).

## 2.    Analysis

Again, assuming *arguendo* that Plaintiff has met her burden of proving up a *prima facie* case of disparate impact, Defendant must present a business necessity for the policy. *See Teamsters*, 431 U.S. at 335 n.15; *Price Waterhouse*, 490 U.S. at 242-43; *Munoz*, 200 F.3d at 295.

To prove Defendant's business necessity defense, Defendant's use of credit information must be "predictive of or significantly correlated with important elements" of underwriting. *See*

*Isabel*, 404 F.3d at 413 (internal citations omitted).   As discussed in Part III.B.2 *supra*, Defendant has met its burden with respect to underwriting.   Defendant also asserts that absent its ability to determine risk using credit, its position in the market would suffer from competitive adverse selection.   (Pl.'s App. at 254, 268 (Mallassee Depo.); Pl.'s Supp. App. at 131-32 (Cummins Depo.), 389, 439 (Dusenbury Depo.), 821 (Mabe Depo.).)   The Court concludes that Defendant has sufficiently established that the use of credit is correlated with Defendant's competitiveness in the homeowner's insurance industry.   Accordingly, the burden shifts to Plaintiff to refute Defendant's necessity defense or provide alternate, less discriminatory means by which Defendant can achieve the same legitimate business goals.

Plaintiff has provided no means by which Defendant can achieve the same business goals (reducing risk of loss and maintaining competitiveness) in a less discriminatory way and has presented no evidence that credit is not predictive of loss.[20]   *See Isabel*, 404 F.3d at 411; *Banos*,

---

[20] Plaintiff argues that "Nationwide cannot, at this time, allege a business justification defense because it is not at issue in the present motion for summary judgment.  In fact, the Court's December 6, 2004 Order did not authorize Plaintiff to undertake discovery into [Defendant's] business justifications for using credit criteria and [Defendant] refused to turn over many documents requested by Plaintiff on the basis that the business justification defense was not at issue."  (Pl.'s Supp. Br. at 26.)

However, Plaintiff's argument is contradicted by the evidence.  Plaintiff submits evidence indicating that on December 30, 2004, Defendant stated by letter its position that the issue of business justification was not part of the Court's Order directing discovery. (Pl.'s Supp. App. at 1766.)  Plaintiff subsequently filed a Motion to Compel on January 25, 2005, asking the Court to compel Defendant to produce documents responsive to her request number 8, which reads: "All documents relating to any studies, analyses, or reviews completed regarding the use of credit information or credit scoring in underwriting your policies, including all documents regarding the relationship or correlation, if any, between credit and risk of future claims..." (Pl.'s App. Cited in JSR dated January 27, 2005, filed Feb. 4, 2005, Ex. C, at 7.)  On February 4, 2005, the parties filed a Joint Status Report indicating that the parties resolved their disputes regarding request number 8 so that "Defendant has agreed to search for and produce documents responsive to document requests numbered 8 and 18, with the exception of documents relating to 'low income individuals.'" (JSR, filed Feb. 4, 2005, at 4.)

The Court concludes: (1) that the issue of business necessity is a matter of dispute in the Motion for Summary Judgment; (2) that the Court's December 6, 2004, Order authorized discovery on Defendant's business necessity ("limited discovery related to the disparate impact

28

398 F.3d at 892; *Lanning*, 181 F.3d at 485; *Bullington*, 186 F.3d at 1312.  (*See* Pl.'s Argument, Transcript, at 16 ("A regular disparate impact case is where you can't prove intent, that [defendant] didn't impose this neutral policy to discriminate; it just happens to have the affect [*sic*] of discriminating.  And so the reasoning goes that if it has a legitimate business purpose, even though it affects, for example, minorities more severely than others, that that is the defense, and the only thing the plaintiff can say in response in a disparate impact case is, "Well, you can achieve your same business goals in a less discriminatory way.")

Accordingly, Plaintiff has failed to meet her burden to overcome summary judgment as to her individual disparate impact claims under § 3604.  Therefore, Defendant's Motion for Summary Judgment as to those claims is **GRANTED**.

---

of Defendant's use of credit history in Texas as it pertains to Plaintiff"); (3) that the Court's March 24, 2005, Order authorized discovery on the issue of pretext which is sufficiently fungible to the business necessity issue; ; (4) that discovery in fact proceeded on the issue of business necessity and/or pretext; and (5) Plaintiff's ability to rebut Defendant's business necessity argument was not dependent upon Defendant's compliance with the Joint Status Report, filed February 4, 2005.

**IV.      CONCLUSION**

For the foregoing reasons, Plaintiff's individual and class claims of disparate treatment (intentional discrimination) and disparate impact (disparate effect) claims arising under §§ 1981, 1982, and 3604, are **DISMISSED** and Defendant's Motion for Summary Judgment is **GRANTED**.

Judgment will be entered accordingly.

SO ORDERED.

DATED: August 2, 2005.

    /s/ Barefoot Sanders                              
BAREFOOT SANDERS, SENIOR JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS